IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No: 1:22-cv-00154

ALLISON MITCHELL,

    Plaintiff,

v.

SOUTHERN HEALTH PARTNERS, INC., a Delaware Corporation,

    Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, Allison Mitchell, ("Plaintiff" or "Ms. Mitchell") by and through her undersigned attorneys Albrechta & Albrechta, LLC, respectfully submits the following as her Complaint and Jury Demand in the above-captioned case.

### INTRODUCTION

1. This is an action for relief from violations by Defendant Southern Health Partners, Inc. ("Defendant" or "SHP") of the Public Health Emergency Whistleblower Act ("PHEW"), C.R.S. §§8-14.4-101, *et seq.*, of the right of Plaintiff to be free from unlawful employment discrimination, harassment, and retaliation because she raised reasonable concerns about workplace violations of government health or safety rules, and because she raised concerns about significant workplace threats to employee and public health and safety related to a public emergency. SHP also created and enforced an unlawful policy that prevented or limited Plaintiff's disclosure of information about workplace health and safety concerns in violation of the PHEW Act.

2. During Ms. Mitchell's employment she witnessed egregious disregard and active flouting of public health orders by health care professionals charged with caring for the incarcerated

population at the La Plata County Jail who were particularly vulnerable to quick community spread of COVID-19.  As a registered nurse who has dedicated her life to providing health care, it was particularly appalling to watch Defendant's utter disregard for the most basic public health orders such as wearing masks, social distancing, and quarantining at home if showing symptoms.  This caused Plaintiff significant distress, anxiety, and fear.

3. Plaintiff witnessed Defendant's employees of all ranks, including her manager, openly engage in opposition to and/or openly mock public health orders intended to prevent the spread of COVID-19 in the community at-large, let alone in an incarcerated population.

4. When Ms. Mitchell raised reasonable concerns about workplace violations of government health or safety rules and about significant workplace threats to employee and public health and safety related to a public emergency, Defendant retaliated against Ms. Mitchell.  The consequent hostile work environment, discriminatory disciplinary actions, and retaliation at the hands of Defendant forced Plaintiff to involuntarily resign from her position.

**PARTIES**

5. Plaintiff is an individual who is a permanent resident and citizen of New Zealand whose address is 60 Red Cottage Drive, Lake Hayes Estate, Queenstown 9304.

6. At all relevant times, Ms. Mitchell was an "employee" of the Defendant as defined by the PHEW Act, C.R.S. § 8-14.4-101(5).

7. Defendant SHP is a Delaware Corporation registered as a foreign entity in Colorado, with its principal place of business at 2030 Hamilton Place Blvd, Ste. 140, Chattanooga, Tennessee 37421.

8. Defendant's place of business in La Plata County for all events listed herein was 742 Turner Drive, Durango, Colorado 81301.

9. At all relevant times, Defendant was an "employer" of Plaintiff as defined by the PHEW Act, C.R.S. § 8-14.4-101(3).

## JURISDICTION AND VENUE

10. This Court has diversity jurisdiction over the causes of action in this Complaint pursuant to 28 U.S.C. § 1332, as Plaintiff is a permanent resident of New Zealand and Defendant is incorporated in Delaware with a principal place of business in Tennessee.

11. The matter in controversy exceeds the sum of $75,000.00, excluding interest and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because Defendant employed and terminated Plaintiff in this District and the events which led to this cause of action occurred in La Plata County, Colorado.

## ADMINISTRATIVE PROCEDURES

13. Plaintiff filed a complaint with the Colorado Department of Labor and Employment Division of Labor Standards and Statistics (the "Division") on August 17, 2021.

14. The Division provided Defendant with notice of the charges of discrimination.

15. The Division exercised its discretion and chose not to investigate Plaintiff's charge.

16. The Division sent Plaintiff her Notice of Right to Sue and Exhaustion of Administrative Remedies on October 22, 2021.

17. All administrative remedies and conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF FACTS

18. On March 11, 2020, Governor Polis issued Executive Order D 2020 003, "Declaring a Disaster Emergency Due to the Presence of Coronavirus Disease 2019 in Colorado."

19. On March 22, 2020, Defendant hired Ms. Mitchell as a nurse at the La Plata County Jail.

20. Ms. Mitchell was qualified for her position and performed her job to the satisfaction of her employer.

21. Ms. Mitchell began working for SHP at the jail at the beginning of the COVID-19 global pandemic in March 2020.

22. From the beginning of the pandemic Ms. Mitchell's new co-workers and manager made it clear that they believed COVID-19 was a hoax. Their language, demeanor, and behavior was hostile toward anyone who did not agree with them.

23. By early April 2020 Governor Polis began issuing executive orders closing businesses and implementing protocols to slow the spread of COVID. (See D 2020 007, 008, 013, 017).

24. On April 22, 2020 Public Health Order 20-26 was issued by the Colorado Department of Public Health and Environment (CDPHE). Order 20-26 was the first to require employees at Critical Businesses or those performing Critical Government Functions to wear face masks at work.

25. Throughout 2020 Ms. Mitchell's co-workers and managers were outspoken about their views that the pandemic was a hoax and that COVID-19 was not real.

26. For example, the primary office at the La Plata County Jail that housed SHP staff had a large white board at the center of the office where Ms. Mitchell's workspace was when she was working.

27. Ms. Mitchell's co-workers regularly wrote large messages proselytizing their conspiracy theories about COVID-19 and COVID-19 vaccinations and anti-mask wearing messages on this whiteboard.

28. These messages would regularly appear on the whiteboard written by the nurse who was working the shift prior to Ms. Mitchell, knowing that Ms. Mitchell was on shift next and would have to look at the messages throughout her entire shift.

29. Based on conversations with co-workers Ms. Mitchell believed that these messages were directed primarily at her because it was generally understood that Ms. Mitchell did not subscribe to the conspiracy theories that her co-workers actively promoted at work.

30. One message stated: "'The world has 6.8 billion people thats [sic] headed up to 9 billion. Now if we do a really great job on new vaccines, health care, reproductive health care services, we could **LOWER** that by perhaps 10-15 percent.' As quoted by **BILL GATES**."

31. One of Ms. Mitchell's co-workers believed that Bill Gates was putting microchips into the vaccines in order to monitor everyone. This co-worker also tried to convince Ms. Mitchell that COVID-19 vaccines were deadly, which was part of the government's plan to lower the global population. This co-worker argued that the vaccine made women sterile and that she knew 14 people personally who had died from a stroke after receiving the COVID-19 vaccine.

32. Another message instructed Ms. Mitchell to:

>  **Research:**
>
>  i. Vaxxed
>
>  ii. Vaxxed 2
>
>  iii. Georgia Guidestones

Vaxxed and Vaxxed 2 are widely recognized as pseudoscience propaganda films alleging a cover-up by the Centers for Disease Control and Prevention (CDC) of a purported link between the MMR vaccine and autism. The Georgia Guidestones are a monument that has come to represent advocacy of population control, eugenics, and internationalism which has made the monument an object of a number of conspiracy theories.

33. Another message read: "Real Eyes, Realize Lies." One of Ms. Mitchell's co-workers repeated phrases such as this one when espousing her belief that the media was lying about COVID-19.

34. Another message read: "F-E-A-R has 2 meanings: Forget everything and run or face everything and rise. The choice is yours." This was a simple message implying that the global reaction to COVID-19 was entirely fear based, rather than based on recommendations by credible world and national health organizations, agencies, and physicians.

35. Finally, another message read: "**Government**: Derived from the Latin verb Guvermo, Governare meaning 'To Control' and the Latin noun Mens or Mentis meaning 'Mind'. TO CONTROL THE MIND."

36. Each of these conspiratorial messages were clearly related to COVID-19 based on the ongoing dialogue of her co-workers where they regularly promoted their beliefs that COVID-19 was a hoax and was a conspiracy of some to control the population of the world and destroy Christianity, among other things.

37. In addition to these conspiratorial messages regularly showing up on the primary whiteboard in the office, Ms. Mitchell's co-worker also posted hard copy printouts of anti-public health propaganda around the office.

38. For example, one printout showed a picture of a standard face mask stating, "This is a mind control device."

39. Another printout stated: "**Caption on box of standard facemasks:** This product…will not provide any protection against COVID-19 (Coronavirus) or other viruses or contaminants"…. Yes, they even admit on the box holding the face masks that they don't work for coronavirus. **So why would they force you to wear them under penalty of law?** Because, in the grand scheme of things, **wearing the mask has nothing to do with coronavirus**. It has to do with **initiating you into the new global order, and our new place within it.**"

40. Another printout that was hung around the office stated: "COVID 19 – **SATANIC RITUAL** – Eye Opening truth." Ms. Mitchell's co-worker who posted this printout simultaneously explained that COVID-19 was started as a way for satan worshippers to take down Christianity. This same co-worker stated that public health guidance related to hand washing and mask wearing was part of a satanic ritual.

41. In addition to this handwritten and printed propaganda that littered the office throughout 2020, the co-workers also wore facemasks designed to mock the public health orders.

42. For example, one co-worker wore feminine pads over her face, and her manager, Ms. Amber Fender, wore a facemask that was thin see-through mesh.

43. All these actions were done in conjunction with the overwhelming printed, spoken, and written propaganda about COVID being a global conspiracy posted around the office on a regular basis.

44. Ms. Fender also made her belief known that COVID-19 was just the flu that needs to run its course, and that it was being played up by the media so that President Trump would lose the election.

45. Ms. Mitchell disagreed with the way that her co-workers thought and behaved regarding the pandemic. She was also well aware that she was in the minority in the office based on her beliefs that the COVID-19 health emergency was real and that the public health guidelines, orders, and recommendations were legitimate and meant to help, not hurt, people.

46. In the summer of 2020 Ms. Mitchell witnessed SHP employees stop wearing masks at work in the La Plata County Jail.

47. Towards the end of the summer 2020, Ms. Mitchell approached Ms. Fender to inquire what SHP's policy was on wearing masks in the office.

48. Ms. Fender informed Ms. Mitchell that SHP's corporate policy was that so long as employees stayed 6 feet apart, they were not required to wear masks in the office.

49. Ms. Fender also told Ms. Mitchell that because SHP were contractors they did not have to follow jail policy or public health guidelines regarding masks.

50. Ms. Mitchell was shocked, appalled, and scared by this blatant disregard for public health and safety and went to Captain Aber to inform him of the fact that SHP was refusing to follow jail policy and public health orders.

51. Ms. Mitchell also felt strongly that nurses not wearing masks at work was setting a terrible example for all the other County employees who were required to abide by the jail policy and public health orders to wear masks in the jail.

52. In October 2020, Ms. Mitchell came down with a fever.

53. Per jail policy she was not permitted to come into work. She communicated with all her co-workers and could not find someone to cover her shift. As such, her manager, Ms. Fender, had to come in to cover for her.

54. Ms. Fender made it known that she was upset about having to come in because she had family in town. Ms. Fender told Ms. Mitchell that she allows sick employees to come into work and that she can rest in the office.

55. Ms. Mitchell was shocked to hear her manager encouraging her to come to work with a fever, body chills, and fatigue during the pandemic.

56. Ms. Mitchell did not come to work, but she did come to the jail to meet Ms. Fender in the parking lot to retrieve a COVID test. Ms. Fender did not even wear a mask for this exchange.

57. This incident further highlighted the fact that management at SHP's La Plata County Jail operation were recklessly ignoring all public health guidelines.

58. By November 2020, COVID-19 case numbers were spiking again in La Plata County and around the country. Ms. Mitchell was being extra cautious to avoid catching COVID.

59. Ms. Mitchell was forced to share an office space with co-workers who still refused to wear masks.

60. Rather than confront those co-workers directly, knowing that they would not respect her opinion and would attract the ire of her co-workers, Ms. Mitchell went to her manager, Ms. Fender.

61. Ms. Mitchell asked Ms. Fender if she could work in Ms. Fender's office when it was empty because Ms. Mitchell's desk was less than 6 feet from co-workers who refused to wear masks.

62. Ms. Fender responded that she would speak with corporate.

63. Ms. Mitchell received a text later that day stating that corporate does not require a private office to be provided to her and that Ms. Mitchell may wear her face mask if she is uncomfortable.

64. On or around November 18, 2020, the entire office had clearly been told about Ms. Mitchell's request and had turned against her.

65. First thing in the morning a nurse co-worker wore a full-face mask, shield, and gloves while working on charts at her desk, which was clearly done to mock Ms. Mitchell based on that employee's history of strong and vocal beliefs about COVID being a hoax. This same nurse had not worn a face mask in the office for months.

66. The administrative assistant arrived at the office that morning and immediately yelled at Ms. Mitchell because, "now I have to wear a f***ing mask because of you…I am more likely to get COVID from you and your family than you getting COVID from me!" She then dramatically screamed "get out of the office. You're standing too close. I don't want to get COVID from you!" while making sweeping motions with her hands as if to push Ms. Mitchell out of the office.

67. Ms. Mitchell went to Ms. Fender immediately to report her complaints about how the staff were treating her and to try to decipher what had happened overnight to precipitate this open hostility towards her.

68. Ms. Fender did not acknowledge Ms. Mitchell's complaint and excused the administrative assistant's behavior because she was "overqualified for the job" and "does a good job at work."

69. Everyone in the office was outwardly angry with Ms. Mitchell for her simple and justified concern about working less than 6 feet from unmasked co-workers during a COVID spike before vaccinations were available.

70. Immediately after this incident, Ms. Mitchell called Ms. Fender and told her what happened. She also emailed and texted with Ms. Fender about these events and her complaints about what had happened.

71. Also on or about November 18, 2020, Ms. Mitchell wrote a detailed explanation of what happened on that date, but did not send it for fear of retaliation.

72. Ms. Mitchell was very worried about losing her job for sending these complaints, so she kept her complaints as brief as possible and did not send her detailed explanation yet.

18. A few weeks later, towards the end of December 2020, nothing had been done in response to her complaint or the events that occurred.

19. So Ms. Mitchell submitted a formal multi-page complaint and submitted it to Ms. Fender. This complaint contained her complete detailed explanation of events which she had written on or about November 18, 2020 - the date of the incident and her complaints about what had happened, the way she was being treated in reaction to a simple request to use an empty office so she could socially distance from employees who refused to wear masks, and complaints about the workplace's failure to follow basic public health guidelines.

73. Ms. Fender acknowledged her receipt of the formal complaint and informed Ms. Mitchell that her complaint was submitted to SHP's Human Resources department.

74. In her complaint, Ms. Mitchell made it clear that she was being subjected to a hostile work environment for no other reason than she was attempting to protect herself by following basic public health orders of working at least 6 feet away from co-workers who refused to wear a mask while in the office doing paperwork.

75. On or about the day that Ms. Mitchell submitted her formal complaint, she also met with Captain Aber to inform him of SHP's treatment of her.

76. There was no investigation or follow up into Ms. Mitchell's complaints by SHP management, Human Resources, or corporate.

77. Further, Ms. Mitchell was also told that the administrative assistant would no longer be providing support to Ms. Mitchell. For Ms. Mitchell's entire employment at SHP the

administrative assistant answered phones for Ms. Mitchell and helped her with paperwork and other administrative tasks so she could focus on being a nurse.

78. All of that support ended after Ms. Mitchell reported how the administrative assistant treated her for a simple request to work in an empty office to socially distance from employees who refused to wear masks.

79. After her complaint, Ms. Mitchell had to perform her nursing duties and all of the administrative work associated with them, which directly impacted how much work she could do in any given shift.

80. On or about December 2020 Ms. Fender tested positive for COVID-19. Ms. Fender then came to work knowing that she was COVID positive.

81. Ms. Fender did not report her positive test to her superiors or quarantine per the jail policy, or per public health orders and guidelines.

82. Ms. Fender knowingly ignored public health orders and as a result exposed many at-risk inmates and co-workers to COVID-19.

83. Shortly thereafter, Captain Aber came to Ms. Mitchell to request her assistance doing contact tracing to attempt to prevent an outbreak at the jail because he had just learned that Ms. Fender came to work when she knew she was COVID positive.

84. SHP Regional Manager, Stephanie Harris, arrived at the La Plata County Jail sometime on or about January 2021 for a site visit shortly after the jail revoked Ms. Fender's security clearance.

85. Ms. Harris made no further inquiries into the hostility Ms. Mitchell reported to Defendant.

86. Ms. Mitchell pulled Ms. Harris aside during her visit to again explain her co-workers' and manager's behavior throughout 2020, the anti-public health propaganda posted all over their

office, the flouting of public health orders, and the incident that occurred on or about November 18, 2020.

87. Ms. Harris responded by telling Ms. Mitchell that "you are just going to have to let this go."

88. Regional Manager Harris had no concerns regarding the propaganda that was posted all over Defendant's office throughout 2020.

89. Regional Manager Harris also had no concerns about nurses who were serving the vulnerable incarcerated population at La Plata County Jail refusing to follow the most basic public health guidelines of wearing masks or staying home when sick.

90. Ms. Mitchell also raised her concerns about Ms. Fender's judgment as a manager related to her disregard for public safety during the pandemic.

91. Ms. Harris responded that Ms. Fender has been with SHP for a long time and has done a good job and that SHP did not want to lose Ms. Fender as an employee.

92. Later in January 2021 Ms. Mitchell learned that instead of disciplining or terminating Ms. Fender for her reckless behavior, SHP promoted her to a Regional Manager.

93. In March 2021, SHP abruptly began disciplining Ms. Mitchell for false events or for things that she had always done a certain way for her entire employment.

94. When the new manager arrived to replace Ms. Fender, SHP changed Ms. Mitchell's schedule to make her position less appealing for her work-life balance.

95. The new manager, who had never worked with Ms. Mitchell, began her job with a preconceived dissatisfaction that Ms. Mitchell was a problem and poor performer, even though Ms. Mitchell had never been told that there were any problems with her performance.

96. From her first day the new manager immediately began searching for reasons to discipline Ms. Mitchell.

97. In one instance in the first week of her starting her position, the new manager stated that Ms. Mitchell would need to be reprimanded for something Ms. Mitchell did not do.

98. Ms. Mitchell corrected the new manager and explained that it was not her but another nurse. And that the issue had already been resolved and was clearly stated in detail in the patient's chart.

99. The new manager was openly frustrated when she could not discipline Ms. Mitchell.

100. On March 12, 2021, SHP gave Ms. Mitchell a "counseling" write up and simultaneously suspended her employment.

101. Ms. Mitchell was never warned or given any advanced notice or ability to make improvements prior to being suspended.

102. By the end of March, it was clear that Defendant's goal was to get rid of Ms. Mitchell.

103. On April 1, 2021 Ms. Mitchell submitted a resignation letter stating, "I feel it is the intention of Southern Health Partners to terminate me because of my complaints about the company's failure to follow or enforce even the most basic public health guidelines. I do not wish to resign, but I do not believe I have been left with any other viable option."

104. Defendant unlawfully retaliated against Plaintiff and constructively discharged her employment because she raised reasonable concerns about workplace violations of government health or safety rules and because she raised concerns about significant workplace threats to employee and public health and safety related to the COVID-19 public emergency.

**CAUSES OF ACTION**

# FIRST CAUSE OF ACTION
## (Discrimination in Violation of the PHEW Act for Raising Concerns Protected by the Act – C.R.S. § 8-14.4-102(2))

105. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

106. During the course of her employment Plaintiff raised reasonable concerns about workplace violations of government health or safety rules related to the COVID-19 public health emergency.

107. During the course of her employment Plaintiff raised concerns about significant workplace threats to employee and public health and safety related to the COVID-19 public health emergency.

108. During the course of her employment Plaintiff engaged in opposition to conduct made unlawful by the PHEW Act.

109. Defendant at all relevant times, knew that Plaintiff had raised concerns protected under the PHEW Act.

110. Defendant treated Plaintiff less favorably than similarly situated employees who did not complain about Defendant's public health violations.

111. Defendant's illegal discriminatory acts made or allowed working conditions to become so difficult that Plaintiff was compelled to resign.

112. Defendant's conduct was intentional, willful, wanton, and malicious.

113. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered injury and damage for which she is entitled to compensation pursuant to the PHEW Act.

114. Because of Defendant's unlawful conduct, Plaintiff is entitled to judgment in her favor, and substantial economic, non-economic and punitive damages, in an amount to be proven at trial.

# SECOND CAUSE OF ACTION
## (Adverse Action of Constructive Discharge in Violation of the PHEW Act for Raising Concerns Protected by the Act – C.R.S. § 8-14.4-102(2))

115. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

116. Defendant and its agents and employees created discriminatory, difficult, and unbearable working conditions for Plaintiff.

117. A reasonable person in Plaintiff's position would have felt compelled to resign under these conditions.

118. Plaintiff did in fact resign from her position because of these conditions.

119. As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained economic and emotional damages, resulting in damages in excess of $75,000 to be proven at trial.

120. Defendant's unlawful actions were intentional, willful, malicious, and done with reckless disregard to Plaintiff's right to be free from discrimination based on raising concerns protected by the PHEW Act.

## THIRD CAUSE OF ACTION
**(Retaliation in Violation of the PHEW Act for Raising Concerns Protected by the Act – C.R.S. § 8-14.4-102(2))**

121. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

122. Plaintiff engaged in protected activity by making numerous complaints to Defendant's agents and employees about Defendant's employment practice that required Plaintiff to work in an office that believed COVID was a hoax and where public health orders were ignored.

123. Plaintiff reasonably believed that this term and condition of her employment was unlawful.

124. As a result of Plaintiff's complaints, Defendant, its agents, and its employees took materially adverse actions against Plaintiff, including but not limited to, suspending her employment.

125. Defendant's retaliatory actions would deter a reasonable employee from engaging in protected activity under PHEW.

126. As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained economic and emotional injuries, resulting in damages in excess of $75,000 to be proven at trial.

127. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from retaliation.

128. Because of Defendant's unlawful retaliatory conduct, Plaintiff is entitled to judgment in her favor, and substantial economic, non-economic and punitive damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Hostile Work Environment and Harassment in Violation of the Colorado Public Health Emergency Whistleblower Act for Raising Concerns Protected by the Act**
**– C.R.S. § 8-14.4-102(2))**

129. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs.

130. Defendant subjected Plaintiff to unwelcome conduct by forcing her, as a term and condition of her employment, to work in an environment that ignored public health orders.

131. This conduct was severe and pervasive. On a regular, daily basis Plaintiff witnessed her co-workers ignoring basic public health orders, mocking public health requirements, and displaying, distributing and espousing anti-public health propaganda.

132. Plaintiff found her work environment to be hostile and heavily charged with discrimination against anyone who wished to comply with basic public health orders in the midst of a public health emergency.

133. A reasonable person, particularly one with an education and background in health care, in Plaintiff's position would have found the work environment to be hostile and polluted by discrimination against anyone willing to raise reasonable concerns about workplace violations of government health or safety rules related to the COVID-19 public health emergency.

134. Management level employees knew, or should have known, of the conduct of Defendant's employees working on location at the La Plata County Jail.

135. Defendant did not exercise reasonable care to prevent the creation of a hostile work environment charged with PHEW discrimination and retaliation and did not exercise reasonable care to investigate and stop the behavior even after Plaintiff's repeated opposition to it.

136. As a direct, legal, and proximate result of this discrimination, Plaintiff has sustained economic and emotional injuries, resulting in damages in an amount in excess of $75,000 to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Workplace Policy that Limited or Prevented Disclosures of Information about Workplace Health and Safety Practices in Violation of the PHEW Act – C.R.S. § 8-14.4-102)**

137. Plaintiff reasserts and realleges the allegations set forth in the above paragraphs

138. Plaintiff raised her concerns up through Defendant's chain of command and was told that she was going to have to "let it go" by Defendant's regional manager.

139. Defendant enforced a policy that prevented or limited Plaintiff's disclosure of information about workplace health and safety concerns.

140. By retaliating against and constructively discharging Plaintiff, Defendant made this policy clear to all of its employees at the La Plata County Jail that concerns about workplace health and safety related to a public health emergency were not welcomed or permitted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant and prays for the following damages which exceed $75,000.00:

A. The greater of $10,000.00 or lost front and back pay as a result of the above incidents;

B. Other compensatory damages, including but not limited to compensation for damage to Plaintiff's reputation, emotional distress suffered because of Defendant's unlawful conduct, and all other noneconomic damages to which Plaintiff is entitled;

C. Punitive damages;

D. Prejudgment interest and post-judgment interest;

E. Reasonable attorney fees incurred in this action, pursuant to state law;

F. The costs of this action; and,

G. Any further relief provided by statute or law and that the Court deems just or equitable.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury.

Dated this 19th day of January 2022.

By: s/ David T. Albrechta
**David T. Albrechta, esq**
**Eleni K. Albrechta, esq.**
ALBRECHTA & ALBRECHTA, LLC
530 Main Avenue, Suite D3
Durango, Colorado 81301
Telephone: (970) 422-3288
E-mail: david@albrechtalaw.com
eleni@albrechtalaw.com

*Attorneys for Plaintiff Allison Mitchell*